at all. All right. If any of the attorneys, anyone who's going to argue, please step up and identify yourselves for the record. Good morning. My name is Michael Rhesus from Smith-Adamson, and I represent the defendant's appellant. Mr. Rhesus? Todd Smith, Your Honor. It's Powell Rogers and Smith on behalf of the appellate. Mr. Smith. Good morning to both of you. We will permit each of you to have about 15 minutes for your presentation, and from that, Mr. Rhesus, you may save some time for rebuttal. And we won't cut you off. You know you'll have the amount of time you need. All right. Thank you. We may please the judge and the bill. I am here this morning on behalf of defendant appellant Howe Freightways. This is an appeal from a judgment entered on a jury verdict in favor of the plaintiff for about $19 million. We've raised a number of issues on appeal. Today, with time permitting, and I know time is precious, we will focus on three issues. First, whether Howe was entitled to judgment notwithstanding the verdict. Second, whether the discovery discretion. And third, whether the exclusion of Franklin Greene's pre-occurrence testimony was an abuse of discretion. If we are correct on any of these grounds, the judgment below cannot stand. First, Howe was entitled to judgment notwithstanding the verdict when plaintiff did not show that the Howe unit on the shoulder caused the accident. Here, as Herbert Terrell, the Heiner truck driver, died in the accident, we don't know why his semi left the highway, side-swiped the lit-up bobtail on the shoulder at a high rate of speed and ended up in the ditch. So, Mr. Reese, is it your position that there is not a sufficient basis for any of the elements on this based on you don't know how the truck left the highway? Just only on proximate cause. For purposes of this argument, we would certainly assume negligence. We would assume there was a breach of the safety regulations. Are you assuming negligence based on the sanctions that were in it? It could be based on the sanction or it could be based on the evidence presented at trial. The J&OV argument is based solely on proximate cause and on no other issue because proximate cause is as much an element of the case as any other the plaintiff must prove. And we would refer the where, likewise, no one knows why vehicles left the highway and struck persons and a tow truck on the shoulder. Without evidence that Herbert Terrell went on the shoulder for some reason related to the presence of the how unit, plaintiff did not show that how proximately caused the chain Unlike the cases the plaintiff cites, Smith and Kinch, here there was no evidence that Terrell could not see where he was going due to the sun. Every witness who testified at trial, Chaney, Green, Schallhorn, all said they could see the three vehicles that were on the shoulder. The bobtail lit up like a Christmas tree, had its lights on, all of its lights on. Wasn't there a witness that said that there was difficulty? I'm sorry? Wasn't there a witness that did testify there was difficulty seeing? There were witnesses who testified to the setting sun and the fact that the sun made it more difficult to see. Correct. But no one said they couldn't see ahead and no one said that they couldn't see the three vehicles that were on the shoulder. Now, it's possible. Well, why isn't this a concurrent negligence case then? I mean, what's your argument there? There were several grounds of negligence that were presented to the jury, weren't there? There were several grounds and each ground requires some showing that the presence of the vehicle was a cause of the Heiner tractor-trailer leaving the highway. If the vehicle would have left the highway no matter what, Proximus Plus was not shown. Wasn't it foreseeable at any time for this other truck to go off the road? What's the point of those? Before we get to foreseeability, though, we have to talk about cause and fact because cause and fact is as much a requirement for proximate cause as legal cause. And for cause and fact, I go back to Salinas and I go back to Henderson. No one knows why Herbert Terrell left the roadway. Now, can I say that it couldn't be the sun as a matter of circumstantial evidence? Well, it's possible. I can't say that it couldn't have happened that way. Could there be some other reason why he left the highway? Such as he was trying to put on his T-shirt, which was evidence that we wanted to present, but the judge refused to allow us to present. Well, do you want to talk about the T-shirt? Was it a T-shirt or some other kind of shirt? It was a T-shirt. All right. And was there an offer of proof in this case? Oh, yes, there was. And was that offer of proof that perhaps between 8 and 20 seconds passed during the time that the driver may have been changing his shirt? That was the time frame, wasn't it? That was, and I think that's a great time period. But wouldn't Judge Lipscomb focus on the mile, half mile to a mile and a half rather than the temporal? Well, there were various estimates provided. Okay, but the temporal estimate was between 8 and 20 seconds. That was, yes. And that certainly would be the shortest. And I think a jury could, you know, consider that and give weight to it. And if the jury thought that, you know, it was 8 to 20 seconds, and now I'm going into my Franklin Green argument all, you know. Which is fine. Which is fine. Which is fine. Which is fine. I get that. Well, there would certainly be a short enough time to give rise to the reasonable inference that that conduct was continuing up until the time and the place of the accident. Think about it for a second. What are all the things you need to do to put on a T-shirt when you're barreling down the expressway or the highway at between 60 and 70 miles per hour? First, you've got to find it. Because Franklin Green testified that when he was observing Herbert Turrell, Turrell was seated catty-corner and was looking for something, reaching for something. Okay. Didn't find it yet. So he finds it. Now he has to find, you know, the holes where he saw it. I mean, all of it. Mr. Reese, the speculation is getting a little out of control here. What we do know is Mr. Green said that the time aspect was 8 to 20 seconds. Yes. But the distance was half a mile to a mile and a half. You know what? That would be the subject of cross-examination, right? And I'll tell you what. I could live with 30 to 60 seconds. I could live with 60 to 90 seconds. You compare this case with Hiscott versus Peters. You compare it with Spencer versus Wondolowski. And what you have is a shorter time period than what you have in Spencer, for example. In Spencer, you have a motorist who's a motorcyclist who's observed riding on the shoulder, weaving in and out of stop-and-go traffic 10 minutes before the report of the accident. And this court said that the trial court abused its discretion in excluding that evidence because it was relevant to a crucial issue of cause and fault. Now, how is this case any different than Spencer? This is not a momentary action that could be repeated or stopped innumerable times in a 10-minute period. It's not like weaving in and out of traffic. It's not like, oh, I had to change the radio channel because I didn't like the music or I just glanced at the glove box, which is what some of the plaintiff's cases involve. This requires a certain amount of sustained effort to put on a T-shirt. You have to put it over your head. Your hands have to be off the steering wheel. I don't know how you can put it on unless your hands are off the steering wheel. And when it's on over your head, I think you're probably distracted and unable to see where you're going. That was a crucial defense. If the jury had heard that evidence, it would have been clearly entitled to find that Herbert Turrell left the roadway for reasons unrelated to the presence of our vehicle. And in that case, we would have gotten a verdict in our favor, and we were denied that. Okay. So let's go back to proximate cause. Yeah, let's go back to the definition of what cause and effect is, because that's where you were. Yes. And it says, I mean, I think, a defendant's conduct is a material element and substantial factor in causing an injury. Yes. If absent that conduct, the injury would not have occurred. That's right. Okay. And what you're saying is that the fact that there were none of the reflectors on, the fact that the truck was parked on this roadway for, what, two hours? Two hours. The fact that the truck didn't try to move off the exit. What were some of the other things that were before the jury? You're saying that none of those had anything to do with this accident? What I'm saying is, if you don't know why Herbert Turrell left the roadway, just as you don't know why the van driver left the roadway in Salinas, or why the motorist left the roadway and slammed into the tow truck in Henderson v. Beckman, it is speculation whether the vehicles on the shoulder had anything to do with why the accident took place. They were there. They were there. But the fact that they were there is not sufficient proof. The fact that they were there. Yes. And that it's an extremely dangerous position to be in, and that there were violations of the Transportation Act that require the reflectors, and that it was there for two hours. You're just saying that none of this in any way could have contributed to the injury and that the jury actually got this totally wrong and should never have reached this decision. Well, based on, you know, we've talked a little bit about one basis for trial error because I don't want to predict on what a jury would do if they heard everything. But to go back to the issue of proximate cause, all we have is circumstantial evidence. We don't have any direct evidence of what Herbert Turrell was doing and whether he could see where he was going and whether it would have made any difference if the triangles were put out, for example. Doesn't that sort of dovetail into your argument about the actions of the driver, that since everyone was deceased as a result of this, that this evidence about the T-shirt should have been admitted to trial? Absolutely. Absolutely. It becomes even more important. It's even more important in the case when there are no witnesses who can testify as to, you know, what actually happened. We had no way to combat all of the speculation about, you know, the sun was in his eyes and he couldn't see where he was going. Well, we had another explanation for how the accident happened that was not speculation because we know circumstantially he's seen with bare chested, something that you're not likely to forget when you're traveling 60 miles per hour, and when Mr. Green goes up to the cab in the ditch after the accident, he has his T-shirt on. That's circumstantial evidence. And that was, you know, pretty solid. And whether it's 8 to 20, you know, I think 8 to 20 seconds is favorable to us. That was Mr. Houlihan's questioning on cross-examination of Mr. Green. Didn't Greg also say that it could have been maybe only a half a mile between the time that he saw him with the shirt off to when the accident occurred? It could have been a half a mile. To a mile and a half. To a mile and a half, right, right, right. A little over a mile. Absolutely, absolutely. And the judge said it was too remote. It was too remote despite the fact that we've got, you know, good case law and Hiscott and Spencer that says if it's a reasonable inference, it's up to the jury. And we have faith in the jury when it comes to cross-examining Mr. Green's observations and his ability to observe. Do you want to talk about the sanctions? Yes, I do. So with regard to the sanctions, I'm going to start with the engine, and I thank the Court for getting me into that. Because ultimately, when we made our motion to reconsider, Judge O'Hara said that the motion to reconsider was moot because there was a second ground for sanctioning us, and that was the fact that the engine was not preserved. Now, we submit that was a misapplication of the six-factor Szymanowski test. Mr. Reese. Yes. Your position is that Howie didn't have any duty to preserve the tractor, is that correct? Correct. Because the lease terminates with the death of the tractor. Mr. Lanehoff died. It was impossible at that point when he died and when the tractor is a wreck to perform. It was impossible. It was objectively impossible. It was impossible. So Howie clearly knew four people have died in this. Yes, I did. You clearly know this case is going to litigation, right? We know that there is going to be litigation, absolutely. Okay. Didn't your company have a lease that gave it possession and rights to it? Which terminated. I mean, it is death. I mean, if you can't drive the tractor, if you're dead. When did it terminate? I'm sorry? When did it terminate, the lease? Well, it would have terminated I think there was a definite time term, a definite term. Okay. I can't remember if it was one year or two years. I mean, that's going to be in the lease. But the point of it is it can terminate early. Howie was in possession of the tractor. No, it was not in possession. Who was in possession of it? It would have been a pound in Iowa where it was towed after the accident. We were never in possession of it. But you were in legal possession. You had a lease. I'm sorry. I can't – I don't agree with that because at that point the lease terminates on – the lease should terminate on death. You can't objectively perform it at that point. And that's – we're only in possession and control when the vehicle is in operation. I believe the language in the lease talks about operation. It's not that we're in possession of it when it's still a wreck. When the insurance company paid, they were paying the widow. We did not have any superior right in terms of dictating the disposition of the salvage. Well, was Howie or Howie, however you pronounce it, were they contacted, though, about whether to preserve this? Well, they were asked – the insurance company asked us whether we wanted to meet the salvage bid. We said, no, we're not interested. We didn't want to pay money out of our own pocket. I don't know of any case that says that we have to pay money out of our own pocket to preserve something that we don't own. And I don't know of any case, and they have not cited any case, that says that we had that duty. And I want to say one other thing. Remember – and I know that we're getting close to the 15 minutes. Whatever time we give you, we're going to give you. Fair enough. Fair enough. And that is that, you know, this isn't a products case where you would say that the vehicle is the subject of the litigation. But is that really the only circumstances under which the court could enter a sanction? No, no, no. So I want to go back to what the standard is. Cheminofsky, remember, has a standard that says that we have to show knowing and willful defiance of the rules or a court order. It's a higher standard of culpability than a negligence foliation claim against the insurance company, which they never brought. Okay? And the other thing to keep in mind when Judge O'Hara was using the six factors is that he thought that it didn't really cut either way, that the plaintiff did not ask for the vehicle until five years into the litigation. We're a month from trial, and for the first time in response to our motion to reconsider, they asked for the sanction to be kept in place based on our failure to preserve the engine. Now, why should we anticipate something that they didn't anticipate? Let's assume that you're right, that he was wrong when he said it didn't cut either way. Right. So, but he did consider the six factors. At least he said he did. Did he? Did he not say that? He said that he certainly referenced the factors. I don't know that he discussed them all. All right. So, and then our standard of review of his abuse of discretion. Yes. So let's say he got the one factor wrong. Does that mean that he abused his discretion? I think if he gave undue weight improperly to one factor, that would indeed be an abuse of discretion. It shouldn't be a misapplication of those factors, and that would be sufficient. With regard to the other basis for the sanction, which was the failure to or the supplemental production of documents that came in in January of 2017. Look, they could not have surprised or prejudiced anybody. The maintenance records that were produced were cumulative of other records that have been timely produced on January 4, 2013. We offered. But Mr. Green gave absolutely no consistent reason on why those were overlooked. Is that correct? You're right. You're right. He was disorganized. He was mistaken. But the court ultimately said that the basis for the sanction was that the timing. Remember, Judge O'Hara had a problem with the timing. Even though we wound up having everything done, keeping the original trial date, everybody was deposed, everybody was re-deposed, every expert was disclosed, everything was done to prepare the case for trial on May 4. So the timing didn't come into it. The other basis was, well, you didn't provide a verified explanation, and that may be going to the question you're asking. Well, look, we're going to do more than simply provide an affidavit. Here's Dave Grimm, a second chance, have at it. Ask him what happened, why he was wrong, why he said he purged something, when really they were there in a different place. That doesn't sound like something nefarious to me. If he had said, well, I've got records. In a file marked Langlois accident, that's a little bit questionable, don't you think, Mr. Reeses? Well, you know what, he submitted to a deposition, and ultimately the basis for the sanction was not based on Dave Grimm's credibility. It was based upon the fact, apparently, that we didn't preserve the engine, okay? And, again, I'm not seeing anything in the case law that says that we have to pay good money out of our pocket to preserve the engine in this type of case. And also in terms of the timing, when everything got done before trial. So tell me, what's the harm? Why is this the most extreme sanction? Remember that when we're talking about discovery, we're talking about trying to bring out the truth in a way that is not cumulative on the offending party. Well, what would have been a more appropriate sanction? All right, we have to pay for the second session of his deposition. And we voluntarily, we said before this motion for sanctions was even made, we said we'll reproduce Dave Grimm for his deposition, and we will agree to extend all deadlines. Was there any challenge, though, about the engine itself and that the records and maintenance of it were questionable? I'm not sure if I, I'm sorry. Are you saying there was really absolutely no reason why plaintiffs would have wanted that to be able to examine the? They never got an engine expert. We produced these records on January 4, 2013, and in the next four plus years, they never got an engine expert. They never had an engine expert at the time of trial. And to go back to the reference you made about how we should have limped along to the next exit, well, one problem we have is they never had a competent witness to testify to that. Yeah, you argued that that witness was not competent. That's right. He's just a trucking consultant. All right. What's that standard of review when the court? It's an abuse of discretion. And you know what? It sometimes happens, and that's why we have appellate courts. Of course. That's right. All right. Okay. Do you want to finish up? I think that's probably my cue. For all the reasons set forth in our brief, we ask you to reverse either for a judgmental or for a neutral. Thank you for your time. All right. Mr. Smith, you're going to have about 20 minutes. May it please the Court.  May it please the Court. One thing I notice immediately is the idea that Mr. Terrell left the roadway. Mr. Terrell was on that roadway, and I'm not a defense lawyer for Mr. Terrell, but Mr. Terrell was on that roadway, and this was a sideswipe occurrence. Wasn't there multiple testimony regarding how far off the tow truck was to the fog line? Some people said six inches. Some people said it could have been right on the fog line. Yes. Very close. Very close. So it would be six inches off, and you can see on these photos the sideswiping, the mirrors having contact, the side of the trailer, the tires scrubbing against it. Was that, however, a ground of alleged negligence, that the location of where Langhoff put the truck was improper? Not necessarily Langhoff, but I'll tell you what I think is a reasonable inference here, and that is those triangles that are supposed to be out there going back. Daniel Walsh, the second Hanifin vehicle, pulls up, parks his vehicle 150 feet or so back, 100 to 150 feet. Why? Why is he that far back? And he has basically just gotten there. Why is he that far back? Because there aren't any triangles. There's nothing. So he's substituting. That's what he's doing. Not at any request. He's just doing it. And so he's reacting to the lack of any warnings that are out there. What happens then is a sideswipe, because Hanifin's vehicle is the one that gets sideswiped, right back there at 150 feet. And, Heinrich, if you look at the video I invite you to, maybe you have already, record 335, I believe it is, the video of the police officer that's coming, going directly into the sun, and I'll address the sun in a moment, but going directly into it, you can see these trucks as they fill the lane. You can see how the truck will occasionally, any truck will occasionally drift onto that. And so what we're talking about here is you've got to get out of that shoulder. You can't be in that shoulder. You can't be sitting there doing diagnostics, which is what they had him doing. And the response from the CEO of the company, well, maybe we were trying to kill two birds with one stone. That's what he said about that. We're going to diagnose this, and then we'll get a tow truck. Wasn't one of the other grounds of the negligence that went to the jury was the fact that they didn't call a local tow truck to immediately try to move this mass off the highway? Yes, that's right. They did not. And the admissions of Mr. Grimm on that point are critical here, because they really tower over any of these sanctions. So if the court were to say that there was an abuse here in some way, and those narrow sanctions, frankly, are in some way prejudicial, the towering evidence that we had that overwhelmed the negligence was brought out on admissions by Mr. Grimm. What about Mr. Reese's argument that we have absolutely no information as to why that other driver went off the road, and sideswiped? Well, went off the road. I believe his tires may well still have been on the fog line. He's got pieces of it. He's got double tires. He's got tires that rub against a vehicle that is clearly by a scar on the shoulder about six inches north of the fog line, is where the flat happens to the Hanifin tow truck. It digs, we believe, and I think the reconstruction said this, it digs into the pavement there. So you have a scarring of the pavement roughly six, seven, eight inches away. That means he's sideswiping right really at the fog line and hitting with things on the side of the truck, including a step that sticks out and that kind of thing. So it's a very narrow interstate with a fairly narrow shoulder, and he's hitting him right at the shoulder. It's not like he's leaving the roadway. He's 95 or more percent in the lane, just like any of these trucks may be. What about the T-shirt? Well, abuse of discretion, of course, is standard, and I think the judge who sat there for two weeks listening to all the testimony had the opportunity in the defense case to let this in, exercise his discretion properly. A mile to a mile and a half as Green is seeing him go by. But Mr. Smith, he also testified that it could have been eight to 20 seconds. That's a little bit different, and wouldn't that be something for the jury to take a look at? Isn't that up to the jury to evaluate? Okay, on one side he says eight to 20 seconds, on another he says half a mile to a mile. Well, here, I think when you put it all together, it simply didn't make any sense. It was total speculation. On this witness's part, one, and two, it would have been speculation clearly for the jury. Are we to speculate, as was being done up here, that indeed someone – how quickly can Herb Terrell put a T-shirt on? How slow is it? Did the judge rule it was – well, I guess he did sort of rule it was speculative. Yes. But he also said it was too remote. Now, is there any question that this Mr. Green, when he was deposed, said that he first saw the driver, Terrell, without a shirt on? When he observed him driving on the highway, he said he was sitting catty-corner, he called it, and he had no shirt on. Yes, but I think he was bare-chested. Bare-chested, okay. Bare-chested. Now, I think I could speculate. I could speculate that his T-shirt was just pulled up over like this. He's getting some air. He can pull it back over that way. Well, wouldn't that be something that the jury would have been – that both sides would have examined the witness on? I mean, the fact is that didn't this Mr. Green also say that when he got to the crash site, he observed Terrell, right? It's Terrell, with a shirt on. That's what he said, yes. All right. And isn't this a case where you have no actual eyewitnesses? It's all circumstantial. It was a reconstruction case. Well, of course. But I'm just saying. So if there was something to be explored, wouldn't it have been this? Because there was testimony that, one, when he first saw Terrell, he could have been half a mile to a little more than a mile up before the actual collision. And then he also said it could have been about – well, the lawyer asked him, would I be accurate if I asked whether or not 8 to 20 seconds is the timeframe for when he first saw him and then the collision. And I would say, Your Honors, the judge heard all of this. He weighed all of this. And what he saw ultimately was a mile to a mile and a half as he saw him go by. That's what he said. And then at the top of the hill – pardon me. Isn't that enough, though, to show that there was perhaps some distractive driving going on? But need it not be down there at the site? Are we going to speculate that from a mile, a mile and a half, that he then did something along that way? How is that different than the speculation regarding where the tow truck was in relation to the fog line? Aren't we being called to speculate on that? We had multiple witnesses testify to different distances from the fog line. No, no, because you can see the marker. It's a physical piece of evidence in a photograph. It's right there by the fog line. Well, some witnesses said that there was enough room for somebody to walk between the fog line and the truck. I think Your Honor is speaking of down at the Langhoff vehicle, which is about 100 to 150 feet further. The Hannesen tow truck is the one that was hit. It was straight by. And so 150 or so feet later, there's about a foot and a half at the Langhoff truck. And, yes, I think that is correct. There would have been room between the fog line. But here no one disputed that it was something under a foot, six to nine inches essentially is what that was. Okay. What about sanctions? Sanctions. Well, what happened was in the fall of 2016, we take Mr. Grimm's deposition. He said, no, that 10 pages or so that you have isn't nearly what I have. And he said, well, this is all we were given. He says he must have purged them. There was a five-year. Wasn't it a five-year gap between the turning over of the first and then the? Yes. We requested the documents. They gave us what they said were the documents. And then we finally get Mr. Grimm's deposition. And when we ask him some questions and we show him what we've been given, representative of Mr. Langhoff's records and the maintenance records, we get the reaction that, no, there's more than that. Did the testing or the lack of testing have anything to do with the sanction that he entered, would you say? His failure to take part. Well, I think ultimately the whole picture of this turbo did. In other words, they did some work on the turbo, and then later on, we get records not even from them. We get records from the Heiner, the co-defendant, who sends us records showing the insurance companies exchanging information and working out what they're doing about the damage to vehicles and so on. And we get information about the salvage on the truck that had occurred. And we get information eventually that they indeed had an opportunity and they approved of the salvage. The CEO did. There's testimony in that regard. And Ms. O'Brien, in terms of going to the CEO and saying, do we want this? And they don't. They got a $23,000 check from their own insurance company related to this for the storage and things of that nature. So they're very involved in this. They had the opportunity to hang on to this. Their insurance company did as well. Was there ever a request for preservation? Pardon me? Was there ever a request for preservation? We did not make a specific request for preservation. Why? But I think the duty is on them. Frankly, I wasn't involved at that point. But I do believe that the duty is on them to preserve. If they can anticipate under Wetherall and the other case law. I'm not saying. Any difference that nothing was requested? Well, I think we did request the records about it, but ultimately we get the records that they had control of this. I mean, we originally understood that Mr. Langhoff, and he was deceased, and we weren't suing Mr. Langhoff, that Mr. Langhoff was the owner of the vehicle. We didn't have the lease documents until sometimes later. And so what we see is. What about the fact that there was never an expert hired to even examine this thing? Well, we didn't have all the information that ultimately was brought to us and that we saw. I mean, I think we were just at the point, in fact, where we were finishing up fact witnesses and we're going to disclose experts. And we didn't yet have all of those documents from them, and we didn't have any information about the turbo and the not being saved and that sort of thing. How many admissions of liability, then, did the court require? Ten. Ten. Ten. And the ten that were involved, we proved overwhelmingly of seven or eight of them. Can we talk about the safety class? I believe that was one of the deemed admitted allegations, the safety class, whether Langhoff completed a safety class and whether that was required. Because the witness testified to two different things. One, he said it was required before he could get dispatched again. And then he said, no, at that time of the accident, we did not have that policy in place. Well, you know, we can't really control what the witness is going to say. I understand that. But why are we deeming that as admitted negligence if it wasn't required at that time? I believe the testimony at that point was that, indeed, it was required. We had taken Mr. Grimm's deposition, and I think his change in that came at some point later. But I think the court felt, the motion judge felt that because we were getting this so late. Would it make a difference if that was true, that there was no policy in place at the time of the accident that he had to complete a safety class? Yes. Okay. He wouldn't have been on the road. No, no, no, no, no. Maybe I'm misunderstanding. You don't understand. I'm asking, would there be a difference in the trial court's error or not error if there was no policy at the time of the accident that he had to complete a safety training class before being dispatched again? I really don't know. I kind of doubt it. I think he saw that as something that was part of their policy. But I don't think I can really answer the question. Thank you. I apologize for that. In any event, let me just give you what Mr. Grimm said, Your Honors, because the Grimm admissions, I think, overwhelm everything else in the case with respect to their failure to get out there and, one, to put triangles down. They are the number one warning device to be put at the edge of the roadway to alert oncoming drivers. That's the standard with respect to trucking. Yes, those triangles truckers know to look for them because they know that's the requirement to look there. And not count on some substitute from a tow truck with a bar up here with yellow lights. You didn't try to find him a tow, did you, on the towing part? You didn't try to? No. Did you try to find him a close tow? No. You didn't know how far Des Moines was? No. It was close to 60 miles. Cummings, Cummins that he sent him to, gave a phone number to him, was not a tow company. No. Well, there really wasn't any evidence, was there, that would have suggested it wasn't a dangerous condition to have this truck sitting on the road? They all agreed that it was. They said it was extremely dangerous. But he ultimately said on these issues, that would be the correct thing to do, get him off the side of the road. Yes. And you didn't do that. He actually said that was careless of him. And that's the right thing to do, the correct thing, the careful thing, isn't that? And you didn't do that, did you? Yes. I'm correct, aren't I? Yes. You didn't do that. You said it was the right thing to do, and on and on. The triangles, that, the admissions that you see there. Now, that goes to the point of the sanctions. Were the sanctions of any import at all? And under the general verdict rule, we believe there's several things that were proven overwhelmingly that allow this verdict to stand. Well, just one last question. Do you think that you can convincingly argue that if the jury heard evidence about the shirt and him being bare-chested, that there wouldn't be, or perhaps a difference in the outcome? If they thought that the driver, Terrell, was actually taking off his shirt while he was driving, that that might have, or he was trying to put it back on. I think it would have been utter speculation. I think it would have been highly prejudicial. It would have impacted people's thinking, I think. Well, giving this idea that it was speculative, the fact that he, there was testimony at the deposition that he didn't have a shirt on, and then maybe we'll say, you know, 20 seconds later, half a minute later, he has a shirt on. You're saying that from that, there couldn't be any reasonable inference that he was distracted? I don't. All right. And if you see the testimony in terms of where that truck was, there was no erratic driving. The most that happened. He also said he didn't notice any erratic driving. Right. There was nothing unusual. He was going down it. And if erratic driving was being on the fog line or very close to on the fog line, you'll see trucks do that all day long, and you'll see it in that video that was part of the evidence in the case. There's nothing that shows that he did anything like that. All right. Anything further? All right. Mr. Reese, a brief rebuttal. All right. Let's start with the last point, which related to the observations of Frederick Green. The argument about the fact that he wasn't seen to be driving erratically, well, up until the time that that puts both ways, because he could have just as easily been losing control of his vehicle just as he was near the bobtail. Except that, doesn't that sort of, aren't you contradicting yourself, because at the time that he's found in the truck, he's already got this shirt on. I'm sorry? At the time that he's found in his truck. Yes, he's got the shirt on. Right. So presumably, he can be. So he already got the shirt on somehow. He got the shirt on somehow, and it may have been that he was just putting it on, just putting it on when he went off the road. Is that speculative then? I mean, he has the shirt officially on. Your Honor, I can't see how it's speculative compared to, you know, look at Spencer. Somebody's driving on the shoulder, and 10 minutes later, the accident's reported. What was the distraction in Spencer? Spencer was, it wasn't a distraction. It was his pre-accident conduct in driving on the shoulder and weaving in and out of traffic. And the point of observation was 10 minutes before the report of accident was made. That's a much longer time period. And you could say, hey, you know, you could have stopped that at any point as far as that conduct before the accident. But the court said there was an abuse of discretion because there was a reasonable interest that that conduct was continuing up until the time and the place of the accident. Now, we heard a lot about, well, it's speculative with regard to the T-shirt, honestly. And I'm just going to make this comment. I don't know why the T-shirt is more speculative than the sun, because no one testified that they couldn't see the vehicles lit up like a Christmas tree because of the sun. Was the sun a factor? Yes. But even their experts said, I don't know how much of a role the sun played. Mr. Smith said, this is an accident reconstruction case. He never presented any accident reconstruction testimony. All the jury got was testimony as to where those vehicles were placed and they were all placed on the shoulder. Every last vehicle, every part of every last vehicle was on the shoulder. If Mr. Turrell stays on the highway, the accident never happens. I think he also misstated a couple of other things. This highway shoulder had a standard width of 10 feet. Our vehicle was about 1.9 feet to 2 feet from the fog line on the shoulder. The bobtail was completely on the shoulder. There was enough width distance between the fog line and the bobtail for Mr. Green to walk on the shoulder, past the bobtail, and stay on the shoulder. The accident happens because Mr. Turrell, for reasons which we don't know, went off the highway. And unless he went off the highway for a reason that related to the presence of our vehicle, because we did or didn't do something that caused him to leave the traveled portion of the highway, we could not be held negligent. Let me just say a couple of things about the discovery sanction because that's important. Mr. Smith misspoke when he said that it was five years. We produced the documents January 4th. I started then. Okay. Perhaps error. I thought it was about – I thought there were several years between the first turnover and – Well, there were, but it wasn't that long. And, you know, in between – this case was up in the appellate court for a while on a related issue – not related – on an unrelated issue concerning a third-party complaint that we had brought against Hanifin, plaintiff's employer, and whether they were amenable to jurisdiction in Illinois. So I'm not casting aspersions on anybody when it comes to certain delay in this case because there was an appeal under Rule 306. But the fact remains, when it comes to the sanctions, we had three allegations that were deemed admitted that the jury never got to consider, relating to the maintenance, relating to the training, and I don't think that the general verdict rule or the two-issue rules discussed in the briefs has any application when the jury didn't even get to decide all the issues in the case. Justice O'Neill Burke raised a very good question about the – That's fine. It confuses people. I prefer to do that. I'm sorry? Just Burke is fine. Burke. Okay. First time in front of you, I'll know next time. So – but the point of it is that with regard to this question about, you know, was it a policy or whatever, the law is very well settled. An internal policy or guideline does not give rise to a legal duty to continue in perpetuity. If we wanted to send Mr. Langhoff out on the highway without having him go through the online training, we could do it. And that would not be just departing from that voluntary policy. That wouldn't be negligence. Now, that goes to – that goes to the point that the sanction was overbroad because we were being sanctioned for conduct that could not be considered negligent, let alone conduct that the jury never even got to consider. So I don't think you could ever say that the sanction was harmless in this case. It was devastating. Can you imagine trying a case in front of a jury involving a fatality? And it was a tragedy. I'm not here to tell you otherwise. And having to face a jury with those allegations of negligence admitted, I'm not surprised that the jury came back the way it did. And I say that even though we never got the chance to present our theory, and also I believe that the judge should have taken away the verdict based on proximate cause. I think I've raised everything I want to raise. The issues have been briefed for I think about 130 pages in total. We know they're all arguments. It's a privilege and not a right. We are grateful for the opportunity to address you today for all the reasons, again, we ask you to reverse either for a judgment NOV or for a new trial. Thank you very much. All right. Thank you both. The case was well-argued and well-briefed. We will take it under advisement. We're going to take a short recess for the attorneys to be able to move and then the other attorneys to get settled in their spaces. So we'll take a brief recess before we call the next case.